My name is James D. Benak. May it please the Court, and I represent W.H. Magic Valley Holdings, the plaintiff and appellant in this case. To say that this case had an odd procedural history in the trial court would be a little bit of an understatement, but I wanna get right to the heart of the substantive issues in this case. If there are questions about the procedure from the panel, I'll be glad to take those. There are three points, I think, that are central to this appeal. The first is the contract claim, a breach of contract claim, which is count one of the complaint. The second is a fraud claim, which is count two of the complaint. And the third is the issues surrounding the limitations of the contract, consequential damages limitations and a merger clause. So I'd like to talk first about the contract claim. And backing up a little bit, all of these matters are reviewed de novo by this court. This is an appeal from a summary judgment on these issues. There are also construction of contract issues, which are de novo review for this court. The first point is, with respect to the contract, this court has the power to enter judgment in favor of my client on the contract claim. We didn't file a motion for summary judgment, but the authority cited, it's in our brief, at footnote four in the reply brief, the Yellow Book case, makes it clear that notwithstanding that we didn't file a motion for summary judgment, if the facts are pretty clear, and they are clear at this court, it can enter judgment in favor of our client. And that's what... In favor of my client, and that's what I'm asking that this court does. Is it disputed that Appendix A... I'm gonna call them Appendix A and C, because it's a little easier. Is it disputed that those are part of the contract? Yes, they are. It's not disputed? It's not disputed. As a matter of fact, it was stipulated by the parties at the trial court. The stipulation covers one of those, but not both, right? No, it covers both. Okay. So that's... When you say that you've got a breach of contract claim, and the district court had an idea about what was or was not ambiguous about the contract, we should be considering the purchase and sale agreement in Exhibits A and C? Yes, you should. There are three parts to the contract. The first, the PSA. The second is what's called the AR LLC. It's an amended and restated limited liability corporation, which was part of a company agreement, which was part of the closing documents and attached to the PSA. Attached to that AR LLC are two documents. One is Appendix A, and the other is Exhibit C. And those are central, because it's apparent on the record that the court didn't even look at those two documents in its review of this contract. And those documents are central to the contract. So when I look at that, it seemed to me that he decided that New York law applied and then applied it... He doesn't really articulate this, but I think a traditional parole evidence rule and decided the contract's unambiguous, meaning the PSA was unambiguous, I think, and didn't look at those other documents. Is that what you think happened? No. Quite frankly, I don't know what happened. I know that it is not apparent, or it is unambiguous, that he did not consider them, but they were stipulated between the parties as being part of the contract. You don't need the data room to prevail. No, I don't think we do. What's your strongest argument that A and C support your breach of contract claim, please? Well, in Exhibit C, the whole point here was that somehow the contract didn't go to the issue of supplemental reserves. It didn't go to the issue of whether the target, EIH... Well, maybe you can tell us then what document or documents in the record, if any, clearly reflects the party's understanding that the purchase and sales agreement was conditioned on the reserves being refunded after the contract went into effect. Is there anything, can you... Do you have anything that you can point me to that says that? I'm sorry, you know what? I didn't quite get your question. Okay. I'm sorry. What document or documents in the record, if any, clearly reflects the party's understanding that the purchase and sales agreement was conditioned on the reserves being refunded after the contract went into effect? Very good. I thought that's what you said. I just wanted to be clear. Okay. Sorry, I kind of said it fast. If we look at... The contract is including Appendix A and Exhibit C, which it does. If you look at Exhibit C to the AR LLC, that's on the record at page 376 of the record. And let me just turn to it. I have it here in front of me. That's the base case model. That's the base case model. And if you look at the record at page 375, and you look right up in the upper right hand corner, the document states... This is a spreadsheet, so it's a little hard to find. But the document states... Supplemental reserve account at closing $583,000. Yes. It's in tiny font, which made me feel my age. Yes, it is. But it's there. It's actually on page 376. Right. And then the same number shows up. I'm gonna have a question for you about this. At ER331, there's a June 27th, 2014 email that also talks about 5.83 million, and then it says, Exergy Idaho. Exergy is entitled to 10% of that. So you get, I think pretty clearly, to the same 583 million... I'm sorry, 583,000. That's 10% of 5.83 million. Yes. Right? Yes. So you're relying on those two things, but that's not quite the same number that wound up. The numbers might be off by a few cents, but the number of the reserves, $583,868 or whatever the number is, is not disputed at all. And then it's 10% of the total distribution, which is 5.8 million. Can I ask you a 30,000 foot level question? My understanding of the chronology is that there was an agreement on a purchase price for the shares in the LLC, and at that time, I think, everybody thought that the reserves were gonna be returned in 2027. Then it was learned that they were gonna come in 2015. And my question is, at that juncture, I think that was not hidden. I think everybody knew that, and there was consideration, additional consideration paid for the reserves. Correct. Then the reserves wound up showing up in late June, and that's the part I think your client says wasn't disclosed. It was not disclosed to us. Right. So I have a question about that. Was it half a million dollars more that the purchase price was increased? I'm sorry? What was the increase in the... Half a million dollars in the purchase price. Okay. There's other testimony that I read about... Is it Mr. Karkoulis? Mr. Karkoulis, yes. Am I... Someone to not disclose this in the due diligence process. What position did... Is it Eisenberg? What position did that person hold? Can I back up a second? Am I still able to reserve five minutes for my rebuttal? Thank you. Okay. So Mr. Eisenberg is the managing director of something called Ruby Renewables. Ruby Renewables is an LLC which owns... Excuse me, an LLC in which the target, EIH, is a member. So distributions come from Ruby Renewables to the members, including EIH. So when Mr. Eisenberg was talking about a distribution to the target, EIH, he was talking about a distribution from his LLC which was going to go to EIH, which in turn then would be part of the money that was supposed to be transferred. And is it disputed that Mr. Karkoulis asked Mr. Eisenberg not to disclose this early? That is undisputed. Okay. But Mr. Karkoulis really couldn't affect the time that it was paid, right? It was coming from... It's like a refund that... Right. No, he... Because it was 2017, then it was gonna be 2015, but then it came early and he goes, Whoa, don't tell anyone and paid off a debt. Correct. Yeah. Well, the problem is not that it came early, the problem is that he used it to pay something else. That's exactly right. He used that $583,000... Give it to him, you wouldn't be here. Right. He used the $583,000 to pay a debt of a related Karkoulis owned company. The money's anticipated because there's extra consideration paid for it, so it seems to me quite extraordinary. Can I ask you to look at Appendix A, ER 595 and then I've got ER 389. I just want to get both of your, if I could, interpretation. ER 595 shows that the projected net cash, and I think this document was prepared by your team and Mr. Karkoulis said he didn't know about it, but I think this is one of the documents that shows the projected cash, in 2014 was $386,000, then it jumped up in 2015, it was projected at $1.2 million and then it fell back down in 2016 to $706,000. Yes. And the deposition testimony at 389 to 92, which is the parent's opposition to your motion in Luminae, I think admits that this bump up in 2015 was attributed to this anticipated receipt of the reserves. Is that right? That is exactly right, Your Honor. Okay, well that's your position. I've got that and I'll hear his take on that in a minute, but I had that question from the record. Thank you. I have a question about how's your fraud claim against Karkoulis different from its contract claim against EIH? Thank you for asking that question, Your Honor. Can I explain the facts, please, that relate to that? These are, I think, compelling. I'll jump off of the contract claim for just a minute because what I wanna do is talk about these facts. Well, you're using some of your time, you know that. That's okay. Okay. First, June 14, 2017, James Karkoulis, who's the president of EIHP, and I wanna make sure we get this straight, EIHP is the owner of EIH, EIH is the target, I think the court has that clear. He learns from Steve Eisenberg, who's the managing director of Ruby Renewables, in which EIH is a member, that the reserves would be released on June 30, 2014. Now, up until this time, everybody had thought they were gonna be released in 2015. Mr. Karkoulis had... Should be post closing. Would be post closing. Okay. Mr. Karkoulis had negotiated an increase in the purchase price based on that post closing sale when the reserves would be in possession of the EIH target at the time of the closing. That's at the record in 319. He asked, in this same document, he asks Eisenberg not to tell anybody about the release of the reserves, including people on his own team. Now, these people on his team are responsible for updating the due diligence in the sale. So nobody on Mr. Karkoulis' team knows about this. Mr. Eisenberg, true to his word, doesn't tell anyone about it. W.E.H., my client, doesn't find out about it. So Karkoulis meets with Bill Green. Bill Green is the president of my client, W.E.H. He meets with Green on June 17, 2014. He doesn't tell Green about the release and lets Green believe that the reserves would be released in 2015 as they had discussed. Let's him believe by saying nothing. Right. Yeah. Leads him to believe that that is... And I asked him in his deposition, did you and Mr. Green believe at that time or did you have the agreement at that time that 2015 would be the release of the reserves? He said, yes. And that's in the Karkoulis' debt in the record at pages 127 and 128. Karkoulis lies to his own team about the status of the reserves. That's in the record in an email at page 321. He tells his own team that there's nothing going on. One of his team members says, I heard there's gonna be a distribution of 700 thumbs sum up dollars, which would be the 583 plus a normal distribution. Karkoulis says that's nonsense. That's not gonna happen. 321. That's at page 321 of the record. E, I'm just going in alphabetical order here. So this is the fifth point. Eisenberg confirms that the reserves are going to be distributed to members including the target EIH on June 30, 2014. There's a schedule. He sends everybody an email. He says the money's coming. That's in the record at page 860. On June 30th, 2015, the reserves are paid to Fagan, as your honor noted, as part of a pre existing agreement where the money just gets flushed out of an account and goes right to Fagan. And of course, Mr. Karkoulis knows this and he knows it's going to happen. Now, you've said this before and I wanna make sure I understand it right. This is not paying off a debt owed by EIH. It's paying off something else. Paying off someone else's debt. And so in other words, no, there's no benefit coming to EIH from paying it out. Exactly right. It's to pay off the debt of a related company called Exergy. Owned by Mr. Karkoulis. Which is not EIH. Owned by Karkoulis. That's 100%. That's in the record at page 133. July 2nd, 2014, two days after the money is flushed away to Fagan, Mr. Green sends an email to Mr. Karkoulis attaching Appendix A, which your honor has noted, has that big bulge, kind of like a rat through the snake, so to speak. And he's asked him, is this right? And Karkoulis says nothing. Never responds. July. July 2. Closing was in August. August 1. Okay. So it's a date of closing. So Karkoulis says nothing. Never raises the issue again. The case goes to closing. None of the schedules are updated. No material adverse effect has been noted. Mr. Karkoulis signs off on the documents and the deal closes. Sometime in October, Mr. Green finds out about it and says, James Karkoulis, what happened to the money? The June 2 or July 2 email is in the record at page 862. These facts are undisputed. I don't think there's any dispute about these emails and what happened and what Mr. Karkoulis said in his deposition. I think what's important for the purposes of appeal as it relates to these facts is because this is an appeal from a grant of summary judgment, these facts are to be viewed in the light most favorable to my client, who's the non-movement. These facts, if presented to a jury, I don't think anyone, no reasonable jury, could doubt that a fraud has been committed here. So what's the difference to you if you, if we reverse on the fraud but not on the contract? Well, the fraud claim carries with it certain consequential damages, including punitive damages. If it's a contract claim, I think the contract legitimately would bar those and I don't think they'd be recoverable under the law of New York or the law of Montana. But for purposes of a Yes, punitive damages are recoverable and there are other consequential damages too and we should have an opportunity to show those to a jury. I mean, but is it conceivable that you could lose on the contract claim but win on the fraud claim? I don't think it could be. I think if we won on the fraud claim, I think, you know, the thing about this argument about what's a fraud and what's a breach of contract, well, if you commit a fraud that's also a breach of contract, I think you've breached the contract. But just because you breach a contract doesn't mean you commit a fraud. In this case, there's been both. There are various ways to breach contract, in other words. There are. Yeah. And you can commit a fraud and breach the contract but you've still committed a fraud. Okay. Now, we've taken you over and your five minutes totally disappeared but we will give you a chance to respond. Thank you. Good morning, your honors. Jim Malloy, appearing on behalf of the Apali EIH parent and James Karkoulis. Now, is the factual narrative we just heard wrong? It's incomplete but not, I would not say that anything that Mr. Bernach represented to the court. Well, it smells like a week-old mackerel. You know, that's the, on the, you know, what it exactly relates to but it, it doesn't certainly, doesn't certainly, it certainly seems like some sort of misrepresentation. Well, your honor, let me, let me focus the issues for the court. There are really two issues before the court here this morning. Did the court below err on procedural grounds to dismiss the breach of contract claim? That's a fundamental threshold issue. The second is, was the court correct under New York law to dismiss the fraud claim? And on that issue, I really asked the court to focus on a very comprehensive decision by Judge Hellerstein in the DynCorp versus GTE case. We read it. Could you back up and tell me what is your procedural argument first just so I can keep track? I think he's kind of got mushed in your briefing. What's your procedural argument? Your honor, we believe that ultimately on the breach of contract claim, we have solid legal defenses as well as factual. Some defenses would be mixed questions of fact and law. In this case, what the I cannot represent to this court that we filed a summary judgment motion, and therefore, I believe that on procedural grounds, there's a legitimate issue before this court on whether the court erred. I believe substantively. It is atypical, certainly. You had, I think, two motions teed up you collectively, and then the court reframed the issue, right? Yes. Okay. Yes. We believe that ultimately we have strong defenses, and the, and the point here, it's important to get this on the table here right away. It is a bit paradoxical that the appellant is here criticizing the district court for sua sponte, imposing summary judgment when no motion was pending, and now comes before this court and asks you to do the same to my client. Yes, but it's tempting because the record is pretty bad. So can I just ask, and I'm really trying to get my arms around this, because, you know, hindsight's always 20-20, but are exhibits, what I'm calling A and C, are they part of the contract? Yes. Then how is the contract not ambiguous, at least? Ambiguous? Oh, the court correctly found that the contract is unambiguous. Well, that's my question. How is that possible? If one looks at A and C, and I don't want to re-review the ER sites that I just went through with opposing counsel, but it seems to me there's a very strong implication that his team, Mr. Green, was expecting $583,000 and, in fact, paid consideration to receive those reserves. So what is your best response, please? My response, Your Honor, is that, again, you have to look at the law. The law, so we have to bifurcate, we have to look at whether this is a breach of contract claim, which we recognize there is a breach of contract claim. If you look at the allegations of the second amended complaint, all of the allegations, just like in DynCorp, all of the allegations forming the basis for the fraud claim are what they rely on for their breach of contract. Do you think they overlap entirely? Absolutely. Your response, your legal response, very well, aggressively, I think, well articulated in the briefing for the fraud claim? Yes. And the contract claim? I don't know how you have it both ways. It seems to me either they paid consideration to receive the reserves and their complaint really is that the client didn't perform, didn't deliver, or that your client never intended to give them the reserves and then there's fraud in the inducement. And I just want to give you a fair opportunity to respond to why is that wrong? If it's fraud in the inducement, their remedy is rescission. They have nowhere in this case sought rescission of the contract. New York law is clear. The Sable versus Delman case, if you look at that case, what the party was seeking was rescission of a contract, arguing that you duped me into this contract. If that's the case, sir, then why wouldn't an amendment of the complaint be appropriate as opposed to dismissal? Dismissal. Well, I go back to why this, it just seems to me there's a very strong argument that there's either breach of contract or fraud in the inducement, at least, and maybe both, but you know, sort of one or the other. And your response on the fraud claim is, well, they didn't plead rescission. That's part of my response. My more fundamental response is based on Judge Hellerstein's very well articulated decision in a case that involved sophisticated contracts, sophisticated parties entering into arm's-length negotiations represented by counsel that bargained for and limited their remedies. And so I'm focusing now on the fraud claim. The damage is sought in the breach of contract, $583,868. The damage is sought in the fraud claim, $583,868. They are precisely the same damages. The, in all respects, this case follows what Judge Hellerstein. In that case, the plaintiff, DynCorp, alleged that GTE at every turn deceived them about what they were receiving in the contract. I think the opposing counsel's going to get up and say, we agree that it should be $500,000, not $583,000 in damages, and then your briefing said, well, they didn't plead that, and they're going to come back to say, well, then we should have been given a chance to amend, and we weren't, because really, the district court reframed this issue, so this wasn't litigated. Your Honor, I'm not... Isn't that what he's going to say? He may. I won't speak for Mr. Binock, but... Well, this is your last chance at the microphone, so I want you to have a chance to respond. Your Honor, I believe the proper disposition of this case, at the risk of having a district judge very upset with me if we're back, I believe the proper disposition of this case is a remand on the contract claim. Now, I do need to get back to the Yellow Book case and Positumtiapo, which is the other case they cite. In each of those cases, the court below adjudicated a motion for summary judgment that was presented to it. In this case, no motion for summary judgment was filed on the breach of contract. Now, this court, now asking you to impose judgment as a matter of law, even if the court were inclined, and I don't believe it would be correct, to remand on the fraud claim, there are all kinds of disputed issues of fact. There are disputed issues of fact related to the breach of contract. Doesn't that mean why you go to trial? Well, only if New York law recognizes a cause of action in situations in which sophisticated commercial parties bargain for and limit their remedies. And as I come back to where we were at the very beginning, when I asked, is the story that I just heard correct? You said, yes, but it's incomplete. There are more facts and I'd like to hear what they are because until I hear more, your client's in big trouble. Okay, the additional facts that are not fully developed have to do with what happened in that interim between July 2nd and August 1st closing. And that is, you have a sophisticated party, he gets no response to an email. And what precisely did the email say? It was an email that transmitted this appendix A, and yes, and we have never disputed that Mr. Green believed that the supplemental reserves would come in 2015. That's an email from Mr. Green seeking assurance that the reserves, that's what, that's the email we're talking about? To confirm that the appendix A was accurate and that it was based in part on an anticipated receipt of supplemental reserves in 2015. Okay, so the question, the answer to Judge Fletcher's question, this email you're talking about, the sophisticated party you're now referencing is Mr. Green sending an email seeking confirmation and not getting a response. Got no response. Okay. And I asked you, what precisely did it say? What were the words? You're in, it's in the record, I'm not gonna be able to verbatim state it to you, but it's a James attached his appendix A. I have confirmed that my email of June 24th, I believe it was, or the schedule was accurate. It anticipates reserves coming in 2015. That's a summary of what it said. The reason I want to know precisely, in other words, and I can go back and refresh my memory, is sometimes a response, sometimes the lack of response smells trouble, sometimes the lack of response is, oh okay, we're fine. Right. Is this July 2nd email? Which is, I believe, Your Honor, something that a fact-finder would have to adjudicate. Well, no, you just got to read the words. Right. Please confirm that this schedule meets your expectations and we can discuss the liquidation split when we discuss other matters later this morning. I believe that's right, Your Honor. Okay. So please confirm, suggest that maybe a response was expected. Right, and then you don't do anything to follow up. That's a fact that, and it's undisputed in Mr. Green's deposition, that he did not do anything further after July 2nd. One thing I wondered about this email, maybe doesn't matter, but it's from Bill Green, as you said, to James Karkoulis and Elizabeth, she has a hard last name. She's an assistant to Mr. Karkoulis. Okay, it says James. I have double-checked on the schedule we sent James on the 24th. It's indeed correct. There's two Jameses. Who's the second James? It's the same. I think he's referring, unless he's referring to one of the people in the due diligence team. Okay, so the email, we should understand this to mean the email we sent you? Yes. Okay, thank you. That's helpful. That's right. Your Honor, I want to come back, Your Honors, and emphasize to you that we're based in, that in this law applies. This court is bound to apply the law of New York. The law of New York is very clear in a long line of cases that you cannot recharacterize a breach of contract claim by simply stating that the party never intended to perform the contract. They call it fraud. Is it your contention that the law of New York helps your contract claim, or are we just focusing on fraud now? We're correct. We're focusing on the fraud complaint, and the law of New York will also be beneficial on the contract claim in some respects. How? So, for example, on the limitations of remedies clause. The language, right, so the breach is a separate issue. I will point out that the appellate is relying on a material adverse effect contention. That term is defined by the contract. What some lay person says about it is irrelevant. The material adverse effect is defined right in the purchase and sale agreement, and it says a material adverse effect change in the business assets or financial condition of the projects or the excess of a hundred million dollars. $583,000 is less than one half of one percent. But this was an amount that Mr. Karkulis felt was significant, and he went to Mr. Green and sought additional compensation, negotiated for another half a million dollars for it. Mr. Karkulis thought it was material. In the purchase price, yes. Your honor, we don't, we do not, your honor, this case does involve a breach of contract claim. It does not involve a valid fraud claim under New York law. I'll mention the other three claims, though I don't think they're before this court. Under New York law, to state a claim for constructive fraud, you have to show a fiduciary or special relationship. The same is with negligent misrepresentation. That cannot exist as a matter of law, and the court below was correct in dismissing constructive fraud, negligent misrepresentation. Finally, on unjust enrichment, New York law is very clear that where you have a valid contract between the parties, you cannot go outside that and seek an unjust enrichment claim. So we're really focused here. Your honor, I concede to this court, and at the risk of a judge below being upset with me on the record, saying that we believe procedurally an error was made below. But the proper result in this case is to take this case back for a breach of contract claim. These parties negotiated a commercial contract. They cannot now come in and say, yeah, but it was fraud. New York law is very clear. Judge Hellerstein goes through a very, very careful and good explanation of why in a commercial context like this, you cannot allow a party to say, well, you didn't intend to perform the contract, and therefore, I really want to sue you for fraud. And on this issue Well, I guess so, but I mean, why do you have to, if there isn't any fraud, why do you have to tell people don't say anything? And why do you have to, you know, when they're asking questions, and why, I mean, he, you know, negotiated for extra money, because if he got the extra money, and it came in 2015 as expected, Koukoulis never would have been in 2015 if he got the reserves, could never have paid this other entity, right? Correct. I mean, but he could legally pay this other entity before the contract was signed, I guess. There was a security agreement in place that all of the payments that were to go to EIH. Yeah, yeah, so it's, but, you know, why Senator, again, what you're asking me, I have to ask you to look at New York law. I understand, Judge Fletcher, I understand the court's concern with the conduct of Mr. Koukoulis, but these were sophisticated parties that bargained for a commercial contract represented by counsel, and it is the contract claim that they should be permitted to try to prove. Everything they claim as forming the basis for the breach, for fraud, is what they claim as the basis for the breach of contract. It is the same conduct that they claim. It's not really the same conduct, because the fraud claim includes, as Judge Callahan just indicated, affirmatives allegedly, at this stage, we're construing the facts, right, in the light most favorable, he alleges that there was an affirmative step taken to interfere with the due diligence process. He alleges that Mr. Koukoulis went to Mr. Isenberg and said, pssst, don't tell anybody. So what about that? That's the crux of it. That's where I'm going to fall back on New York law. Okay. And my question is, why is that the same conduct? Well, because what you're saying, Your Honor, is that what he's saying is he doesn't intend to perform the contract. New York law is very clear that that's not a sufficient basis to convert a breach of fraud claim. I appreciate your argument. Okay.  So, in conclusion, Your Honor, we suggest that the proper result here is a remand to the district court solely on the breach of contract claim and to affirm the dismissal of the non-contract claims as required under New York law. Thank you. Thank you. Now, would you put three minutes on the clock, please? Thank you. A couple of things. I want to talk about New York law, but I want to talk about, first, all of the things that went into this fraud that are not part of the contract. Well, it seems like that's what you should talk about, because he's conceded on the contract. Contract is a broken promise. A fraud is an intentional misrepresentation. If you represent at closing that you have $583,000 that you know you don't have, that you've asked somebody to hide, that you've paid to another creditor, that you induced a purchase price for in excess of the original purchase price, didn't tell anybody about it and told everybody to keep quiet about it, and then at closing, you don't call it a material misrepresentation, you don't modify your financial statements, and you sign off on them, that's not a broken promise. That's a fraud. And we're told, and I have to say, I've not yet read Judge Hellerstein's opinion, Judge It sounds as though your remedy, at least according to your adversary, is rescission. Yes, it sounds to me like fraud, but is the remedy anything other than rescission under New York law? I don't know of any case that says that the only remedy for a fraud is to rescind a contract. There are damages that go along with a fraud that have nothing to do with rescission, and in this case, rescission would do no good. The egg is cooked. This is scrambled. You're not going to rescind this contract. I understand that. I mean, that doesn't, and if he's right that the only remedy you've got is rescission, that sounds as though fraud won't help you, but I guess I better learn some New York law on the point. Has that been litigated in the trial court? Has what been litigated? This question about whether you're limited to rescission in the claim. No, it has not. Are you appealing any claim other than breach of contract and fraud at this point? Breach of contract and the fraud. The other claims that Mr. Malloy talked about, I think in the context of the fraud claim, are almost irrelevant. But my question is more specific than that. I want to know if you've abandoned them, or what do you, it doesn't seem to me you're appealing them. We have abandoned them. I know that Mr. Malloy, that the appellee makes an argument in its brief that we have abandoned those. We have not abandoned those. Well, where's your briefing on them? I think the brief comes in the very first paragraph we talk about, the very first paragraph of the opening brief. It talks about those arguments. We don't develop them in the brief. That's correct. Okay. All right. Now, can I talk about New York law for just a second? And I direct the court to pages 13 through I think 17 of our brief, because I think we answered the questions pretty well there. But I just want to read one part of Sabo, Hobart v. Shuler, citing Sabo v. Delman. There is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may nevertheless contract with him in the very instrument of which it was perpetrated for immunity against its consequences, close his mouth from complaining of it, and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. It simply is not plausible that you can have contractual immunity and then with impunity commit a fraud. That's just not good public policy. And that's their argument. Their argument is, well, you've got a contract and therefore you don't have a right for fraud. So Mr. Karkoulis could go ahead and do all these things that he did, just put a limitation of damages or a merger clause in his agreement and just, you know, just like this and walk away from it. Okay. That's not the law and it shouldn't be the policy. We'd ask that Your Honors enter a judgment in favor of my client on the contract claim, send the fraud claim back to the trial court for a trial with instructions that it is indeed a viable claim. Thank you. Thank you. And that, but so, so Sponte, even though you never filed a motion for summer judgment, I think, you know, sometimes you can, I think you can enter the order here and I think that's an appropriate remedy in this case. Sounds like you're asking for an extra cake or something. An extra cake? Yeah. I would, I would like just one cake. Your Honor. Thank you. Okay. Thank both, both sides for your arguments. We'll take a 10 minute break and then when we return, we will hear the Carraway case.
judges: W. Fletcher, Callahan, Christen